UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

THOMAS JOHN BOUKAMP,

Movant,

v.

UNITED STATES OF AMERICA,

Respondent.

No. 5:25-CV-259-H
No. 5:20-CR-165-H(01)

**MEMORANDUM OPINION AND ORDER**

For nearly seven months, Thomas Boukamp preyed on a 13-year-old girl that he met online. Using his computer, he tortured the victim—who was struggling with her mental health and a difficult home life—into an abusive sexual relationship. The abuse culminated in November 2020 when Boukamp retrieved the victim from her Lubbock, Texas middle school and took her to Michigan to serve as his "sex slave." After nine days of repeated sexual abuse, the FBI captured Boukamp and reunited the victim with her family.

A federal jury later convicted Boukamp of 16 child sex crimes. The Court sentenced him to life in prison, and the Fifth Circuit affirmed his convictions and sentence on direct appeal. Boukamp now moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, alleging that his pretrial and sentencing counsel were constitutionally ineffective because they failed to interview the victim before trial, sought trial continuances and a competency hearing, and did not argue at sentencing that he could be rehabilitated.

Each claim fails. Boukamp's counsel did not perform deficiently, nor did the alleged deficiencies prejudice him. *See Strickland v. Washington*, 466 U.S. 668 (1984). And on this record, the Court forgoes an evidentiary hearing and declines to issue a certificate of appealability. Boukamp's Section 2255 motion is denied in full.

## 1. Background

### A. Offense Conduct

Sometime in April 2020, Boukamp (then age 19) met the victim, M.,[1] in an online chatroom. Cr. Dkt. No. 257 at 195.[2] M. was struggling with depression and self-harm; at one point, she attempted suicide by swallowing a bottle of Tylenol. *Id.* at 200; Cr. Dkt. No. 256 at 121–22. Boukamp fueled M.'s depression from behind his computer in Michigan, threatening to rape M. and kill her family. Cr. Dkt. No. 257 at 200. From the start, their conversations were highly sexual. *Id.* at 204–05. Boukamp told M. that he wanted to have sex with her, even though he knew she was a 13-year-old who lived hundreds of miles away in Lubbock, Texas. *Id.* at 205. Over several months, Boukamp threatened M. into sending him nude photos and videos of herself, which he used for his own gratification. *Id.* at 206.

As the relationship progressed, M. became resigned to Boukamp's abuse. *Id.* at 202. M. later stated that she "just didn't care anymore, so [she] just started . . . accepting what was going to happen." *Id.* She even told Boukamp that she loved him. *See id.* at 232. They began planning for Boukamp to travel to Lubbock and take her away. *Id.* at 208. He told M. that she would be his "sex slave" and that he wanted to get her pregnant. *Id.* at 209.

On the morning of November 13, 2020—the day of their planned meeting—M. was "super-excited, extra happy, bubbly, and singing to herself." Cr. Dkt. No. 256 at 154. That afternoon, however, she walked out of her middle school with extra clothes and her baby blanket, got into Boukamp's car, and left behind a note stating that she was running away to

[1] Although the minor victim chose to use her real name at trial, the parties refer to her as "M." in their filings. The Court does the same for consistency and to protect the victim's privacy.

[2] "Civ. Dkt. No." refers to the docket number of this Section 2255 case. "Cr. Dkt. No." refers to the docket number of the criminal case, *United States v. Boukamp*, No. 5:20-CR-165-H(01) (N.D. Tex.).

California. *Id.* at 131; Cr. Dkt. No. 257 at 210–11. Boukamp took the SIM card out of M.'s phone so that it could not be tracked, and the two began driving back to Boukamp's lake house in Michigan. Cr. Dkt. No. 257 at 212, 232–33.

Boukamp and M. spent two days on the road sleeping in the car. *Id.* at 213. On the first night, Boukamp forced M. to give him oral sex behind a gas station. *Id.* at 212, 234. From there, the abuse only escalated, with Boukamp raping, strangling, and hitting M. during their time in Michigan. *Id.* at 167, 215. Boukamp had sex with M. multiple times a day. *Id.* at 214. He also sexually penetrated her with household objects—a turkey baster with garlic and water inside, the ceramic handle of a knife, and a spoon—because he said her vagina "smelled bad." *Id.* at 168–69, 215. To cap it all off, Boukamp pried M.'s braces off with a pair of pliers. *Id.* at 215. M. thought no one was looking for her, she later explained, because Boukamp searched her name on his laptop and showed her that nothing came up. *Id.* at 217. The whole time, M. feared that Boukamp might kill her. *Id.* at 216.

Law enforcement eventually tracked M. to Michigan. *Id.* at 217. On November 22, 2020, nine days after M. was taken from Lubbock, authorities took Boukamp into custody. *See id.* at 218. A search of his phone turned up 32 images and 11 videos of child sexual abuse material, some of which depicted children other than M. Cr. Dkt. No. 259-1 ¶ 64.

**B. Indictment, Trial, and Sentencing**

The history of this case is long and complex. It begins in December 2020 when a federal grand jury returned a five-count Indictment charging Boukamp with various child-exploitation offenses. Cr. Dkt. No. 6. Boukamp retained David Guinn, Jr., a Lubbock-based criminal defense attorney, as his counsel. Cr. Dkt. No. 8. Boukamp pled not guilty to all charges, and the Court set a jury trial for May 2021. Cr. Dkt. Nos. 12; 14.

Over the next year, both sides sought and received several continuances—unsurprising given the amount of evidence and the number of charges involved. About a month before the trial was originally set to begin, Guinn moved for an initial continuance after "unearth[ing]" a "significant mental health issue" with Boukamp, which he needed time to investigate. Cr. Dkt. No. 15 at 1. The Court granted that motion, as well as a second defense motion for continuance to obtain a mental-health evaluation of Boukamp. Cr. Dkt. Nos. 16–18. The Court also permitted a short, one-week continuance on the government's motion, which Boukamp did not oppose. Cr. Dkt. Nos. 34; 35. Around the same time, a Superseding Indictment modified the forfeiture items. Cr. Dkt. No. 37. Trial was reset to early August 2021. Cr. Dkt. No. 35.

Shortly before trial, Guinn filed a third motion for continuance asking for a roughly one-month extension to conduct additional investigation. Cr. Dkt. No. 42. That motion was denied. Cr. Dkt. No. 47. Soon after, an attorney from Buffalo, New York, Mark Mahoney, entered an appearance on Boukamp's behalf. Cr. Dkt. No. 52. Mahoney advertises his firm as "Specialized Autism Criminal Defense Attorneys" providing "Expert Autism Defense Legal Services." Civ. Dkt. No. 1-1 at 4. Mahoney promptly moved for reconsideration of the Court's order denying the third defense motion for continuance, arguing (among other things) that 60 additional days were needed to prepare the case because Boukamp had autism spectrum disorder. *See* Cr. Dkt. No. 60 at 15. While that motion was pending, and mere days before trial was set to begin, the defense moved for a competency hearing on the basis that Boukamp's mental condition prevented him from assisting with his defense. Cr. Dkt. No. 78. The government was skeptical of the defense's

timing, but it also moved for a psychiatric exam to confirm that Boukamp was competent. Cr. Dkt. Nos. 76 at 5; 84.

The Court denied Mahoney's motion for reconsideration and declined what would have been Boukamp's third trial continuance—and the fourth overall. Cr. Dkt. No. 85. In denying the motion, the Court noted "the suspect timing, lack of substance, and conclusory nature of the allegations" raised by Boukamp's counsel. *Id.* at 8. But, given the parties' agreement that an inquiry into Boukamp's mental condition was necessary, the Court granted the defense's motion for a competency hearing and the government's motion for a psychiatric exam and vacated the trial setting. Cr. Dkt. Nos. 86; 87. Boukamp was thus committed to the custody of the Attorney General for determinations of whether he was competent to stand trial and whether he was sane at the time of his offense. *See id.*

Two months later, while Boukamp was still under evaluation by the Bureau of Prisons, the government obtained a Second Superseding Indictment with 11 new counts—all alleging receipt, production, or attempted production of child pornography. Cr. Dkt. No. 89. Guinn withdrew as counsel, but Mahoney stayed on the case. Cr. Dkt. No. 92.

After receiving Boukamp's psychiatric report, the Court set a competency hearing for March 2022. Cr. Dkt. No. 96. Defense counsel moved to continue the hearing based on issues coordinating expert witnesses. Cr. Dkt. No. 99. The Court granted the motion and moved the competency hearing to May 2022. Cr. Dkt. No. 100. Then, on the eve of the hearing, Mahoney moved for yet another continuance, which the Court quickly denied. Cr. Dkt. Nos. 116; 118. In its order, the Court explained that it had granted several prior defense requests for continuance and that it "[would] not countenance further delay based on counsel's lack of diligence or brinkmanship." Cr. Dkt. No. 118 at 3. The Court held

Boukamp's competency hearing as scheduled, and after hearing about six hours of testimony and argument, found him competent to stand trial. Cr. Dkt. Nos. 123; 221; *see United States v. Boukamp*, No. 5:20-CR-165, 2022 WL 1997532 (N.D. Tex. June 6, 2022).

The day after Boukamp was found competent, he was arraigned on the Second Superseding Indictment. *See* Cr. Dkt. No. 125. At the hearing, Boukamp informed the magistrate judge that he wished to represent himself. Cr. Dkt. No. 222 at 3. The magistrate judge conducted a *Faretta* hearing, where he confirmed that Boukamp understood the potential penalties if convicted and urged him not to proceed pro se. *Id.* at 12–15, 27–28; *see Faretta v. California*, 422 U.S. 806 (1975). Despite those warnings, Boukamp knowingly and voluntarily waived his right to counsel and was allowed to represent himself going forward. Cr. Dkt. No. 222 at 46. Over Boukamp's objection, the magistrate judge appointed stand-by counsel from the Federal Public Defender's Office. *Id.* at 38, 45; Cr. Dkt. No. 126. Boukamp proceeded to plead not guilty to all 16 counts in the Second Superseding Indictment. Cr. Dkt. No. 222 at 47.

The Court set a jury trial for June 6, 2022—roughly one month after Boukamp went pro se. *See* Cr. Dkt. No. 127. The trial setting was later partially continued one week "in light of the defendant's pro se status and the government's concerns about the defendant's access to discovery." Cr. Dkt. No. 132 at 1. To that end, the Court ordered the government to provide Boukamp with its discovery and to ensure that he had at least 10 hours of weekly access while detained. Cr. Dkt. No. 130. The government gave regular updates concerning Boukamp's access to discovery, noting, for example, that the Lubbock County Detention Center would allow him to keep printed discovery in his cell at all times. Cr. Dkt. Nos. 139 at 3; 154; 194; 205; 224. The government also arranged for Boukamp's weekly travel to the

federal building so that he could review sensitive discovery that was not allowed at the detention center. Cr. Dkt. No. 139 at 2–4.

Despite the Court's and the government's best efforts to facilitate Boukamp's pretrial preparation, he moved to continue the trial, which the Court denied. Cr. Dkt. Nos. 143; 144 at 2 (noting that the Court had already continued the trial six times). But the Court did extend the pretrial deadlines, thus giving both sides more time to prepare. Cr. Dkt. No. 162.

Finally, on June 14, 2022, Boukamp's trial began. *See* Cr. Dkt. No. 230. Over three days, he ably represented himself, making valid objections and even "[catching] a mistake in the jury charge that no one else did." *United States v. Boukamp*, No. 5:20-CR-165, 2022 WL 11964916, at *3 (N.D. Tex. Oct. 20, 2022) (describing Boukamp's capable performance relative to typical pro se defendants). Boukamp's opening statement, closing argument, and questioning centered around one theory: Boukamp and M. were star-crossed lovers, and so he could not have committed the charged sex crimes against her. *Id.*; *see, e.g.*, Cr. Dkt. No. 258 at 102 ("I love her. I hope I made that clear. I really do."). On day two, Boukamp subjected M. to lengthy cross-examination about their relationship. *See* Cr. Dkt. No. 257 at 220–60. The following exchange occurred, among others:

> Q: (By Boukamp) Did you mean it when you said you loved me?
>
> A: Probably at the time, a little bit.
>
> Q: So do you have any love for me anymore?
>
> A: No.
>
> Boukamp: One moment, Your Honor.
>
> (PAUSE)

*Id.* at 232. After M. told Boukamp that she did not love him, Boukamp visibly broke down in the courtroom. Civ. Dkt. No. 1-2 ¶ 19.

The jury, after deliberating for just over an hour, found Boukamp guilty of all 16 counts. Cr. Dkt. No. 258 at 130–32. In sum, Boukamp was convicted of one count of transporting a minor to engage in criminal sexual conduct, in violation of 18 U.S.C. § 2423(a) (Count One); one count of travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) (Count Two); one count of enticement or attempted enticement of a minor, in violation of 18 U.S.C. § 2422(b) (Count Three); two counts of receipt of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b) (Counts Four and Six); one count of cyber stalking, in violation of 18 U.S.C. §§ 2261A(2) and 2261(b)(4) (Count Five); and ten counts of production or attempted production of child pornography, in violation of 18 U.S.C. § 2251(a) (Counts Seven through Sixteen). *See* Cr. Dkt. No. 89.

After trial, the magistrate judge found that Boukamp waived his right to self-representation by requesting court-appointed counsel after the jury's verdict. Cr. Dkt. No. 248 at 2–3. He thus appointed Michael King to serve as Boukamp's sentencing counsel.[3] *Id.* The presentence report initially calculated Boukamp's total offense level as 50, which was later increased to 52 after the government and probation officer learned that Boukamp hatched a plot to escape from prison with his brother's help. Cr. Dkt. Nos. 259-1 ¶ 235; 275-1 at 1–3. The total offense level was capped at 43, however, because that is as high as the Sentencing Guidelines' Sentencing Table goes. Cr. Dkt. No. 259-1 ¶ 237. So while

[3] After his appointment, King moved for a new trial on Boukamp's behalf. Cr. Dkt. No. 266; *see* Fed. R. Crim. P. 33(a). The Court denied the motion, concluding that Boukamp validly and capably exercised his right to represent himself at trial. *Boukamp*, 2022 WL 11964916, at *4–11.

Boukamp had zero criminal history (and thus had the lowest Criminal History Category of I), he still faced an advisory guideline range of life imprisonment. *Id.* ¶¶ 242, 294.

At sentencing, the Court heard from three character witnesses: Boukamp's father, brother, and sister. Cr. Dkt. No. 291 at 21–28. Much of that testimony, along with King's argument, focused on the mitigating effect of Boukamp's autism diagnosis. *Id.* at 22, 27, 29–30; *see also* Cr. Dkt. No. 273 at 15–16 (defense's sentencing memorandum). King requested a 30-year sentence so Boukamp could have "an opportunity for redemption." Cr. Dkt. No. 291 at 31. But when it came time for Boukamp to speak, he recast himself as the victim. He lamented that "[n]o one can understand what it's like to be filled with violent sexual fantasies all the time"—a trait the world "shirks away from" just "because of who you are." *Id.* at 33–34. And he insisted that he was "never going to stop" loving M. even though "[e]veryone tells [him] it's wrong." *Id.* at 33.

After hearing from the government, the Court analyzed the Section 3553(a) factors. The Court noted that Boukamp's autism could "explain some things," but it rejected "any insinuation" that the condition was a "direct cause" of Boukamp's bullying and raping of M. or his "indulging in child pornography," calling such arguments "incredibly offensive to the autism community." *Id.* at 52. While Boukamp's family support and lack of criminal history "weigh[ed] in [his] favor," *id.* at 50, the Court emphasized the "incredibly violent," "manipulative," and "premeditated" nature of his crimes. *Id.* at 49. And because there was "no sign of potential acceptance [of responsibility or] rehabilitation," the Court highlighted the "very, very significant" threat to the public should Boukamp ever be released. *Id.* at 53.

Thus, after considering all the statutory factors, the purposes of sentencing, and the parties' arguments, the Court sentenced Boukamp to life in prison.[4] *Id.* at 53–54; Cr. Dkt. No. 284.

The Fifth Circuit affirmed Boukamp's convictions and sentence on direct appeal, *United States v. Boukamp*, 105 F.4th 717 (5th Cir. 2024), and the Supreme Court denied his petition for a writ of certiorari. *Boukamp v. United States*, 145 S. Ct. 595 (2024).

### C. Procedural History

On November 24, 2025, Boukamp timely moved to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.[5] Civ. Dkt. No. 1; Cr. Dkt. No. 314. He also requested an evidentiary hearing on the motion. Civ. Dkt. No. 1-1 at 19–20; *see* 28 U.S.C. § 2255(b). The Court ordered the government to respond to the motion (Civ. Dkt. No. 3), which it did (Civ. Dkt. No. 5). Boukamp replied. Civ. Dkt. No. 6. The motion is ripe for review.

## 2. Legal Standards

### A. Section 2255 Motions

Under 28 U.S.C. § 2255, a federal prisoner may move to vacate, set aside, or correct his sentence based on errors that occurred at or before sentencing. *See Cox v. Warden*, 911 F.2d 1111, 1113 (5th Cir. 1990) (observing that Section 2255 "provides the primary means of collateral attack on a federal sentence"). The statute provides four grounds for relief: "(1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is 'otherwise subject to collateral attack.'"

---

[4] The Court also imposed a lifetime term of supervised release in case Boukamp is ever released from incarceration. Cr. Dkt. No. 291 at 54.

[5] Boukamp's Section 2255 motion was due on November 25, 2025—one year after his conviction became final following the Supreme Court's denial of his cert petition. *See* 28 U.S.C. § 2255(f)(1).

*United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) (quotation omitted). Section 2255 is a proper vehicle for pursuing an ineffective-assistance-of-counsel (IAC) claim, whether it was raised on direct appeal or not. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

**B. Ineffective Assistance of Counsel**

The two-part test for IAC claims comes from *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the movant must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) that the deficiency was "prejudicial to the defense." *Id.* at 688, 692. This analysis is "highly deferential to counsel." *Anaya v. Lumpkin*, 976 F.3d 545, 551 (5th Cir. 2020). After all, the Sixth Amendment's guarantee of effective assistance is "not [meant] to improve the quality of legal representation," but only "to ensure that criminal defendants receive a fair trial." *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689).

On the first prong, the movant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89. To that end, courts must be careful to "eliminate the distorting effects of hindsight" while giving due deference to strategic choices. *Id.* at 689.

To prove prejudice, the movant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id.* This showing "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quotation omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Mere "conclusory allegations" of deficient performance and prejudice are not enough; the movant must make a "'specific showing'" of his entitlement to relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (quoting *Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992)). An IAC claim fails if the movant cannot satisfy his burden on either *Strickland* prong. *Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008).

### 3. Analysis

Boukamp raises three IAC claims alleging deficiencies by his pretrial and sentencing counsel. Civ. Dkt. No. 1-1 at 11–19. But the record here conclusively shows that his counsels' performance was not objectively unreasonable, nor can he come close to demonstrating prejudice. Thus, the Court finds that an evidentiary hearing is unnecessary and denies the motion under Section 2255.

#### A. Claim One: Boukamp fails to satisfy either *Strickland* prong in alleging that his pretrial counsel were ineffective for failing to interview M. before trial.

First, Boukamp asserts that his pretrial counsel were ineffective because they failed to investigate and interview M. in the lead-up to trial. Civ. Dkt. No. 1-1 at 11–14. Had they done so, the argument goes, Boukamp would have learned that M. did not love him and did not want a future with him. With this knowledge, Boukamp says that he would have taken a plea deal and not gone to trial, since he believed that M.'s testimony would contradict the government's theory of the case. *Id.* at 13. But there is every indication that M. would not speak to Boukamp or his lawyers, and counsel does not perform deficiently by declining to

pursue a pointless investigation. Even then, the record contradicts Boukamp's eleventh-hour assertion that, had a meeting with M. occurred, he would have pled guilty instead.

**i. Pretrial counsels' performance was objectively reasonable.**

From the get-go, Boukamp must overcome the "strong presumption" of reasonable performance that courts afford to defense counsel. *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689); *see Nelson v. Davis*, 952 F.3d 651, 667 (5th Cir. 2020) ("[J]udicial scrutiny of counsel's performance must be highly deferential . . . ." (quotation omitted)). The presumption encompasses counsel's tactical decisions about how to investigate a case, including by giving "attention to certain issues to the exclusion of others." *Harrington*, 562 U.S. at 109. After all, "[d]efense lawyers have limited time and resources, and so must choose from among countless strategic options." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (citation modified). A strategy is not constitutionally ineffective "unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752–53 (5th Cir. 2003). With that in mind, courts may not fault an attorney "for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 562 U.S. at 110.

Here, there is no evidence or indication that M. had any interest in speaking to Boukamp or his lawyers before taking the stand. Quite the contrary. Multiple times, Boukamp tried to speak with M. before trial to fulfill his hope of resolving the case in a single, 30-minute meeting. *See, e.g.*, Cr. Dkt. No. 221 at 119. He knew that the government denied one such request to speak with M. and her father. Cr. Dkt. No. 139 at 5. And when he posed the same ask to the Court, it was immediately rejected. Cr. Dkt. No. 254 at 97–98; *see also* Cr. Dkt. No. 176 at 2 (denying Boukamp's ex parte motion to meet with M. and her

father because the Court "has no authority to order third parties to meet with a defendant in a setting other than at a hearing or trial"). In the same exchange, the government noted that Boukamp's stand-by counsel had asked whether it could facilitate a meeting between a defense investigator and M. or her father. Cr. Dkt. No. 254 at 97. But M.'s father made it clear that he did not "have an interest" in meeting with Boukamp or allowing M. to do so. *Id.* While Boukamp counters that these instances occurred when he was proceeding pro se, Civ. Dkt. No. 6 at 2–3, they still show M.'s unwillingness to speak with the defense.

Against this backdrop, Boukamp cannot show that M. would have spoken with his pretrial counsel had they tried to interview her. It was hardly unreasonable, then, for his attorneys to focus on more fruitful matters, like moving to suppress evidence obtained during the investigation. *See United States v. Boukamp*, 551 F. Supp. 3d 704 (N.D. Tex. 2021); *see also Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998) (concluding that counsel was not ineffective when he failed to interview alibi witnesses who "were unavailable or would not cooperate with counsel at the time of pre-trial preparation"). At most, the failure to interview M.—if an interview were even possible—was a "reasonable miscalculation" that was not "so fundamental as to call the fairness of the trial into doubt." *Harrington*, 562 U.S. at 110. Boukamp's pretrial counsel made a rational decision to focus their limited resources on investigating their client's alleged incompetence, not on the false, fruitless, and foul theory that he was innocent because his child victim was in love with him. *See, e.g.*, Cr. Dkt. No. 78 (motion for competency hearing). Those kinds of strategic choices fall well within the strong presumption of reasonable performance. In fact, counsels' choice not to follow Boukamp in his continued campaign to use M. for his benefit was the only reasonable decision to make.

**ii. In any event, the record contradicts Boukamp's assertion that he would have pled guilty but for his counsels' failure to interview M.**

Even if Boukamp could show deficient performance, he cannot prevail at *Strickland* step two. The *Strickland* analysis extends to claims that counsel's ineffective assistance led to rejection of a plea offer. *See Lafler v. Cooper*, 566 U.S. 156, 162–63 (2012). Here, the government offered a plea deal that would have limited Boukamp's sentencing exposure to 15 to 30 years' imprisonment. Civ. Dkt. No. 1-1 at 14. In this context, Boukamp must "demonstrate a reasonable probability [he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012). Courts can consider contemporaneous evidence in assessing prejudice at this step. *United States v. Cisneros*, No. 22-40102, 2023 WL 8433978, at *5 (5th Cir. Dec. 5, 2023).

While Boukamp insists that he would have taken a plea if he knew that M. was not in love with him, *see* Civ. Dkt. No. 1-2 ¶ 24, the record shows otherwise. First, Boukamp routinely rejected the idea of entering into a plea agreement with the government. At the competency hearing, the government questioned Dr. Lacie Biber, a forensic psychologist with the Bureau of Prisons who conducted a competency examination of Boukamp. Cr. Dkt. No. 221 at 6, 8. Dr. Biber recalled Boukamp's reluctance to accept a plea deal because, for example, it could include an appellate waiver. *Id.* at 15, 29. On cross-examination, Dr. Biber noted that Boukamp had expressed "the likelihood that he would win if he went to trial and that he wanted to try anything that he could." *Id.* at 62. While Boukamp told Dr. Biber that he "was willing to take a plea if the conditions were something he could agree with," *id.* at 68, he also revealed to a forensic psychiatrist retained by his family, Dr. Denise Kellaher, that "he had a fixation of going to trial and being able to confront and counter [M.] at the trial." *Id.* at 81; *see id.* at 127–28. And, according to

Dr. Biber, Boukamp said "that he was willing to see [if] there was a potential that [M.] didn't want to be with him anymore," which he may only find out at trial. *Id.* at 81.

That testimony alone is persuasive, but additional evidence supports the notion that Boukamp was always unwilling to accept a plea deal. In a conversation with Dr. Michelle Garcia, a clinical psychologist specializing in autism spectrum disorder, Boukamp "stated that a 15-to-30-year sentence would still be like life in prison, and therefore, he would not want to take that." *Boukamp*, 2022 WL 1997532, at *4. And when Guinn told Boukamp that "the most typical course of events" was to accept a plea agreement rather than go to trial, Boukamp "brushed [these considerations] aside" and "declar[ed] that he'd rather die than go to prison." Cr. Dkt. No. 78 at 5. He made these statements despite knowing that the government's case against him was, in his words, "open-and-shut." Cr. Dkt. No. 221 at 63–64; *see also id.* at 80 (Dr. Biber noting that Boukamp "was concerned about taking a plea and what the potential outcome could be if there was ever any sort of sentencing reform"). In short, Boukamp's consistent rejection of a plea agreement contradicts his claim that he would have avoided a trial had he known that M. did not want a future with him.

Second, Boukamp insisted that there was nothing wrong with his behavior, which suggests an unwillingness to accept responsibility by taking a plea. Before trial, and while under a federal child-sex-crimes indictment, Boukamp told Guinn that he and M. were "soulmates" and that he "wishes to propose to [M.] and give her a better life in Michigan" since "Texas allows marriage for those who have attained fourteen years." Cr. Dkt. No. 78 at 6. His pro se motions to the Court—one titled "Motion to Prevent Hateful and Vile Prosecution"—claimed that he was being singled out for what he considered "normal male sexuality," comparing the prosecution to "lynch mobs and gay killings." Cr. Dkt. No. 172

at 1 ("This prosecution is just state sanctioned bigotry, and ought to be considered a hate crime in and of itself. My sexuality, something I am unable to have control over, a part of what makes me who I am, is being ridiculed, punished, and snuffed out by a government acting under the color of law.").

Boukamp pressed the same theory throughout the case. In his closing argument to the jury, Boukamp proclaimed, "[A]pparently I can rape a child who is a teenage girl, when we were teenagers at the same exact time. To me, that's absurd." Cr. Dkt. No. 258 at 118. And during his allocution at sentencing, Boukamp complained about how "[n]o one can understand" his "violent sexual fantasies" and that he was "never going to stop" loving M. even though "[e]veryone tells [him] it's wrong." Cr. Dkt. No. 291 at 33. These are not the words of a man who is willing to accept responsibility and plead guilty.

Third, the record reveals that Boukamp viewed a trial as his last chance to see M.—an opportunity that he likely would not have had with a guilty plea. The Court made clear to Boukamp that it could not compel M. to speak to him or his counsel outside the confines of a trial. Cr. Dkt. Nos. 176 at 2; 254 at 97–98; *see United States v. Soape*, 169 F.3d 257, 270 n.9 (5th Cir. 1999) (noting that "a government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so" (quoting *United States v. Caldwell*, 750 F.2d 341, 346 (5th Cir. 1984))). According to Dr. Kellaher, Boukamp thus believed that a trial was "his only chance to see [M.] ever again" and that he intended to "maximize" his time with her. Cr. Dkt. No. 221 at 141–42; *see id.* at 80–81. Had Boukamp entered into a plea agreement, it was far from certain that he would have seen M. since she had no duty to attend or speak at his sentencing. Thus, Boukamp's fixation on going to trial to confront M. weighs against his belated assertion that he would have pled guilty.

Finally, Boukamp would probably not have even believed his pretrial counsel had they interviewed M. and conveyed that she no longer wished to have a relationship with him. As the Court explained in its competency order, Boukamp has "rigid thinking and beliefs" and—as Dr. Biber confirmed—"'[w]hen he is angry and frustrated, he can become more rigid in his thinking, and less inclined to consider the viewpoint of others.'" *Boukamp*, 2022 WL 1997532, at *9, *13 (quotation omitted). In fact, Boukamp struggled to believe M.'s own statements at trial about her feelings toward him. *See, e.g.*, Cr. Dkt. No. 258 at 102 (asserting that M. could not "admit to the real love that she had for [him]"). There is little indication, then, that Boukamp would have taken his pretrial counsel at their word.

Boukamp, for his part, relies on a snippet from Dr. Kellaher's competency evaluation that she prepared after being retained by the defense team. *See* Civ. Dkt. No. 1-1 at 13. During that evaluation, Boukamp apparently noted, among other things, that "he was not interested in fighting his charges if the victim wanted nothing more to do with him." Cr. Dkt. No. 304-2 at 7. During the same evaluation, however, Boukamp noted that he was "opting for a jury trial because he believed he had a better chance in court." *Id.* at 6. He also "wished to testify in order 'to prove' that the victim loved him." *Id.* And he believed that the "best outcome would be having 'three hung juries' or having a conversation with the victim that went well so that 'the feds drop [sic] the charges'"—not accepting a plea deal to reduce his sentencing exposure as a 20-year-old man facing life in prison. *Id.* at 9. Those statements are consistent with the conclusion that Boukamp had little interest in pleading guilty, even if he knew that M. did not love him. Considering all the evidence and the rest of the competency evaluation, Dr. Kellaher's recollection about Boukamp's disinterest in "fighting his charges" does not meet the high burden of showing *Strickland* prejudice.

For all those reasons, it strains reality to claim that Boukamp would have pled guilty if he knew that M. did not want a relationship with him.[6] Thus, even if Boukamp's pretrial counsel were ineffective in failing to interview M. (they were not), Boukamp has not established prejudice—meaning, a "reasonable probability" that he would have forgone a trial and accepted a plea agreement with the knowledge that M. did not want him in her life. *Frye*, 566 U.S. at 147. Boukamp's first IAC claim therefore fails.

### B. Claim Two: Boukamp cannot demonstrate that his counsels' requests for continuances and a competency hearing were ineffective assistance or that those actions prejudiced him.

Next is Claim Two, alleging ineffective assistance based on his counsels' requests for continuances and a competency hearing. Civ. Dkt. No. 1-1 at 14–17. As Boukamp sees it, his pretrial counsel not only performed deficiently by seeking to continue the trial to assess his competence; the delays also prejudiced him because he otherwise would have gone to trial before the government obtained the Second Superseding Indictment, which added 11 new substantive counts. The Court disagrees.

Start with the first *Strickland* prong. Boukamp's pretrial counsel (specifically, Guinn and Mahoney) sought multiple continuances once they believed that Boukamp might have been incompetent to stand trial. As early as April 2021, only months into the case and before the original trial setting, Guinn sought and received a continuance after "unearth[ing]

[6] This analysis assumes, of course, that the Court would have accepted a plea deal. To "complete a showing of *Strickland* prejudice, defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show" a "reasonable probability" that "the trial court would [not] have prevented the offer from being accepted or implemented." *Frye*, 566 U.S. at 148. There is no right that a federal judge accept a guilty plea, after all. *Santobello v. New York*, 404 U.S. 257, 262 (1971). Without knowing the full terms of the government's plea offer, it is hard to say whether the Court would have accepted or rejected the plea. But let's be clear: Given Boukamp's heinous crimes and threat to the public, the Court would have been reluctant to accept a plea deal that limited its sentencing discretion to 15 to 30 years' imprisonment. *See* Civ. Dkt. No. 1-1 at 14.

what [was] likely to be a significant mental health issue" with Boukamp. Cr. Dkt. Nos. 15 at 1; 16. Guinn obtained another continuance soon after so Boukamp could receive a mental-health evaluation. Cr. Dkt. Nos. 17 at 1; 18. Later, and of most concern to Boukamp, counsel sought a competency hearing and reconsideration of the Court's order denying a third defense motion for continuance. Cr. Dkt. Nos. 60; 78. While the Court denied the motion for reconsideration, it granted the motion for a competency hearing because the government itself agreed that there was "reasonable cause" to believe that Boukamp was incompetent. Cr. Dkt. Nos. 84 at 2 (quoting 18 U.S.C. § 4241(a)); 85; 86.

None of counsels' efforts constitute deficient performance. If anything, they show the opposite. "[T]he criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)). Accordingly, defense counsel must investigate or request a competency hearing if their client has a history of mental illness or intellectual disability. *Thomas v. Lumpkin*, 995 F.3d 432, 451 (5th Cir. 2021). The question of whether to evaluate a client's competency is a "difficult one" that implicates a "wide range of manifestations and subtle nuances." *Drope v. Missouri*, 420 U.S. 162, 180 (1975). While there are no "fixed or immutable signs" that counsel must consider, some considerations include "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence." *Id.*

Here, there were signs from the start that Boukamp may have been incompetent to stand trial. Guinn properly acted on those concerns by seeking continuances that would allow Boukamp to be examined by mental-health professionals. *See* Cr. Dkt. Nos. 15; 17. In seeking reconsideration, Mahoney noted the difficulties posed by Boukamp's autism spectrum disorder. Cr. Dkt. No. 60 at 15–18. And the motion for a competency hearing

detailed the litany of red flags that caused Boukamp's counsel to question his ability to stand trial—red flags that the government agreed provided sufficient cause to warrant a hearing. Cr. Dkt. No. 78 at 3–11; *id.* at 8 ("I have never had a client more difficult to communicate with rationally about the nature of the case, the reality of legal proceedings and law as well as the potential consequences or who was so unable to rationally evaluate his situation or make decisions. [Boukamp] has been unable to assist me in his defense and refused to take my advice at all times."). Put simply, Boukamp's counsel did what they were supposed to do: Investigate their client's competency and seek appropriate relief from the Court. *See Thomas*, 995 F.3d at 451. None of that is deficient performance.

Boukamp mainly objects to the timing. He suggests, for example, that Mahoney was seeking last-minute continuances as part of a "bigger strategy," according to a recorded jail call. Civ. Dkt. Nos. 1-1 at 15; 6 at 6. Boukamp represents to the Court that the quoted statement came from Mahoney. Civ. Dkt. No. 6 at 6. That is wrong. According to the government, it was Boukamp's father, not Mahoney, who told Boukamp that the requests for a continuance were "part of a bigger strategy." Cr. Dkt. No. 117 at 3. And even then, inquiries about counsels' subjective intent behind seeking continuances and a competency hearing are beside the point. *Harrington*, 562 U.S. at 110 ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."). Moreover, to the extent Boukamp frames the competency proceedings as a fool's errand, that argument rings hollow. *See* Civ. Dkt. No. 1-1 at 15–16. The Court held a six-hour competency hearing and issued a lengthy order addressing several contested issues. Cr. Dkt. Nos. 121; 123; 221; *see Boukamp*, 2022 WL 1997532, at *6–15. That analysis was partially the subject of Boukamp's direct appeal. *See Boukamp*, 105 F.4th at 729–34. Thus,

Boukamp cannot reasonably argue that his counsel deficiently requested competency proceedings that were "doomed from the start." Civ. Dkt. No. 1-1 at 15.

But even giving Boukamp the benefit of the doubt on *Strickland*'s first prong, he still cannot show that he was prejudiced by his counsels' efforts to continue the trial. He notes that if his counsel had not managed to move the trial in August 2021, he would have been tried on the five-count Superseding Indictment, not the sixteen-count Second Superseding Indictment that was returned two months later. *Id.* To be clear, Boukamp always faced life in prison. All three charging documents alleged a violation of 18 U.S.C. § 2423(a)—transporting a minor with intent to engage in criminal sexual conduct—and 18 U.S.C. § 2422(b)—enticement of a minor—both of which carry a statutory maximum term of life. *See* Cr. Dkt. Nos. 6 at 1, 3; 37 at 1, 3; 89 at 1, 3. So there is not a "reasonable probability" that Boukamp's bottom-line sentence of life would have been different had he never proceeded to trial on the Second Superseding Indictment. *Strickland*, 466 U.S. at 694.

What's more, Boukamp can show no causal link between the delays and competency proceedings and the Second Superseding Indictment. It is a truism that "a super[s]eding indictment may be returned at any time before a trial on the merits." *United States v. Millet*, 559 F.2d 253, 257–58 (5th Cir. 1977). And there is always the risk in plea negotiations that the government will charge additional offenses. *See United States v. Goodwin*, 457 U.S. 368, 379–80 (1982). The government exercised its right to supersede the operative indictment months before Boukamp even had his competency hearing—which all parties agreed was necessary and which his counsel reasonably requested. *See* Cr. Dkt. Nos. 89; 121. He fails to show, in other words, that the government's efforts to seek the Second Superseding Indictment were anything but the valid exercise of prosecutorial discretion. *See United States*

*v. Molina*, 530 F.3d 326, 332 (5th Cir. 2008) ("The government has great discretion in deciding whether, and which offenses, to prosecute."). Boukamp therefore cannot demonstrate prejudice, further dooming his second IAC claim.

### C. Claim Three: Boukamp's sentencing counsel did not perform deficiently by failing to argue about his client's odds of rehabilitation, nor can Boukamp show that his sentence would have been shorter had his counsel done so.

Boukamp also alleges IAC based on his sentencing counsel's failure to address his likelihood of rehabilitation. Civ. Dkt. No. 1-1 at 17–19. Recall that Boukamp faced an advisory guideline range of life imprisonment. Cr. Dkt. No. 259-1 ¶ 294. With that in mind, his appointed sentencing counsel, Michael King, filed a sentencing memorandum asking for a downward variance to 30 years. Cr. Dkt. No. 273 at 2. The memorandum emphasized, among other things, Boukamp's autism diagnosis. *Id.* at 15–16. But King only advanced those arguments to explain why Boukamp may have committed his crimes, not to expound on his likelihood of rehabilitation. *See id.* The same goes for the sentencing hearing, where King addressed Boukamp's autism only in the context of trying to explain Boukamp's criminal behavior. Cr. Dkt. No. 291 at 29–30. As the Fifth Circuit explained on direct appeal, the Court was never asked to consider "any suggestion that autistic individuals have a particular likelihood for rehabilitation when it comes to sexual misconduct," even though some such evidence was lurking in the record. *Boukamp*, 105 F.4th at 737–38.

For starters, nothing about King's approach to the sentencing proceedings was objectively unreasonable. As noted, there is a "strong presumption" that defense counsel's performance "falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689—a presumption that encompasses decisions at sentencing. *See United States*

*v. Massey*, 79 F.4th 396, 399–400 (5th Cir. 2023). An IAC claim cannot lie based on "[a]n attorney's failure to raise a meritless argument." *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). While there was some evidence from the competency proceedings that individuals with autism are generally treatable for sex offenses, *see Boukamp*, 105 F.4th at 737, the record reveals no indication that Boukamp could be rehabilitated. To the contrary, Boukamp exhibited no remorse or acceptance of responsibility, which the Court highlighted at sentencing. *See* Cr. Dkt. No. 291 at 53 (emphasizing "no sign of potential acceptance [or] rehabilitation"). Time and again, Boukamp proclaimed that he did nothing wrong and that he was "never going to stop" loving M. *See, e.g.*, Cr. Dkt. Nos. 172 at 1 (arguing that the government was punishing Boukamp for his sexuality); 291 at 33. With that evidence, it was not objectively unreasonable to skip a likelihood-of rehabilitation argument.

Moreover, the Court can assure Boukamp that he was not prejudiced by King's lack of argument pertaining to his rehabilitation. As the Court noted at sentencing, Boukamp's total offense level of 52 was one of the highest it had ever seen. Cr. Dkt. No. 291 at 49. The "incredibly violent, lengthy, manipulative, [and] premeditated list of crimes," along with the threat to the public and Boukamp's clear lack of remorse, compelled the Court to impose a life sentence in line with the advisory guideline range. *Id.* at 49–54. Indeed, the Court told the parties that it would have imposed a life sentence in light of the Section 3553(a) factors even if Boukamp's guideline calculations were incorrect. *Id.* at 55. For instance, the Court said that, if it had to, it would have upwardly varied from Boukamp's requested 30-year sentence "in light of the violence that was repeatedly inflicted upon [M.] in part, in light of the demonstrated long-term interest in teenage girls and child pornography and willing[ness] to act on that and the complet[e] unwillingness to show any interest in altering behavior and

for protection of the public." *Id.* And the life sentence, because it was within the advisory guideline range, is presumptively reasonable on appeal.[7] *Rita v. United States*, 551 U.S. 338, 347 (2007). To put it bluntly, there is no chance—let alone a "reasonable probability"—that any argument about Boukamp's capacity for rehabilitation would have persuaded the Court to overlook the aggravating factors and impose a below-guidelines sentence. *Strickland*, 466 U.S. at 694. For that reason alone, Boukamp's sentencing-stage IAC claim fails, too.

### D. An evidentiary hearing is unnecessary.

Lastly, Boukamp requests an evidentiary hearing on his motion. Civ. Dkt. No. 1-1 at 19–20. But a court need not hold an evidentiary hearing on a Section 2255 motion if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). In other words, an evidentiary hearing is not required if "(1) the movant's claims are clearly frivolous or based upon unsupported generalizations, or (2) the movant would not be entitled to relief as a matter of law, even if his factual assertions were true." *United States v. Harrison*, 910 F.3d 824, 826–27 (5th Cir. 2018). More still, a movant is entitled to an evidentiary hearing "only if he presents 'independent indicia of the likely merit of [his] allegations.'" *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013) (alteration in original) (quoting *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008)).

---

[7] Boukamp argues that he was also prejudiced because King's failure to preserve the rehabilitation arguments at sentencing meant that they were reviewed only for plain error on appeal. Civ. Dkt. No. 1-1 at 19; *see Boukamp*, 105 F.4th at 738. But there is no reasonable probability that those arguments, had they been properly preserved, would have made the Court's guideline sentence substantively unreasonable. Further, to the extent Boukamp complains about King's failure to preserve an argument under *Roper v. Simmons*, 543 U.S. 551 (2005), and its progeny, that argument fails. *See* Civ. Dkt. No. 1-1 at 17–18. In the Fifth Circuit, the *Roper* line of cases—which bar sentencing juvenile offenders to mandatory life imprisonment for non-homicide offenses, among other things—do not apply to adults like Boukamp. *See Boukamp*, 105 F.4th at 737 (citing *United States v. Bernard*, 762 F.3d 467, 482–83 (5th Cir. 2014)). Accordingly, Boukamp's preferred *Roper* argument, even if preserved, would have been dead on arrival at the Fifth Circuit.

Here, there are no facts Boukamp could establish in an evidentiary hearing that would entitle him to relief. His claims are largely rooted in generalizations about the record that, even if true, come nowhere close to satisfying the heavy burden of demonstrating *Strickland* prejudice. And as explained above, Boukamp has not shown sufficient independent indicia of his likely success on the merits. *See supra*, Analysis § 3. Accordingly, the Court denies Boukamp's request for an evidentiary hearing.

**4. Conclusion**

In sum, Boukamp is not entitled to post-conviction relief on any of his IAC claims. He cannot establish that his counsel performed deficiently or that their alleged failures prejudiced him. *See Strickland*, 466 U.S. at 688, 692. And because the record conclusively shows that Boukamp's claims lack merit, the Court need not hold an evidentiary hearing. *See* 28 U.S.C. § 2255(b). Thus, the Court denies Boukamp's motion to vacate, set aside, or correct his sentence under Section 2255. Civ. Dkt. No. 1; Cr. Dkt. No. 314.

Also, the Court denies a certificate of appealability under Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, and 28 U.S.C. § 2253(c). For the same reasons above, Boukamp fails to show that reasonable jurists would find this Court's "assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

So ordered on July 30, 2026.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE